1  Kirk Pasich (California State Bar No. 94242)
2  Christopher T. Pasich (California State Bar No. 299191)
3  Caitlin S. Oswald (California State Bar No. 330974)
4  (*Will comply with Local Rule IA 11-2 within 14 days*)
5  PASICH LLP
6  10880 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90024
7  Telephone:  (424) 313-7860
   Facsimile:   (424) 313-7890
8  Email: KPasich@PasichLLP.com
   Email: CPasich@PasichLLP.com
9  Email: COswald@PasichLLP.com

   Peter A. Halprin (New York State Bar No. 4846895)
   (*Will comply with Local Rule IA 11-2 within 14 days*)
   PASICH LLP
   757 Third Avenue, 20th Floor
   New York, NY 10017
   Telephone:  (646) 974-6470
   Facsimile:   (424) 313-7890
   Email: PHalprin@PasichLLP.com

10 Robert D. Mitchell (California State Bar No. 138981)
11 (*Will comply with Local Rule IA 11-2 within 14 days*)
   Krista J. Nielson (Nevada State Bar No. 10698)
12 Ace C. Van Patten (Nevada State Bar No. 11731)
   TIFFANY & BOSCO, P.A.
13 10100 W. Charleston Blvd., Suite 220
   Las Vegas, Nevada 89135
14 Telephone: (702) 258-8200
   Facsimile: (702) 258-8787
15 E-mail:  RDM@tblaw.com
   E-mail: KNielson@tblaw.com
16 E-mail: AVP@tblaw.com

17

18 *Attorneys for Plaintiff*

19                **UNITED STATES DISTRICT COURT**

20                **STATE OF NEVADA – LAS VEGAS**

21 TAO GROUP HOLDINGS, LLC, a Delaware limited liability company,

22                  Plaintiff,

23          vs.

24 EMPLOYERS INSURANCE COMPANY OF WAUSAU, a Wisconsin corporation,

25

26                  Defendant.

Case No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

27

28

PASICH

1   Plaintiff Tao Group Holdings, LLC ("Tao") complains of Defendant Employers Insurance

2   Company of Wausau ("Employers") and alleges as follows:

3   <u>**NATURE OF THIS LAWSUIT**</u>

4   1.   Tao is a global hospitality company that develops, owns, and operates many of the

5   most recognized restaurant and entertainment venues in the world.  Tao and its related entities'

6   (collectively, the "Tao Insureds") brands include Tao, Marquee, Avenue, LAVO, Beauty & Essex,

7   Vandal, The Highlight Room, Luchini and Koma in major markets across the world, including Las

8   Vegas, Los Angeles, New York City, Chicago, Sydney, and Singapore.

9   2.   Here, in Las Vegas, the Tao Insureds have six venues: Beauty & Essex, LAVO Italian

10   Restaurant, Marquee Nightclub, Marquee Dayclub, TAO Asia Bistro, and TAO Nightclub.  These

11   Las Vegas venues generate a significant share of the Tao Insureds' revenue.

12   3.   Given its global operations and worldwide brands, the Tao Insureds purchased broad

13   "all risk" property insurance from Employers against losses in the event one or more occurrences

14   interfered with their operations or precluded or disrupted the use of their locations.  Even though a

15   standard-form "**Exclusion Of Loss Due To Virus Or Bacteria**" has been utilized by the insurance

16   industry for nearly 15 years, and various forms of pandemic exclusions exist, and were indeed

17   utilized by Employers' sister companies, Employers elected ***not*** to include any of these exclusions

18   in the policy it sold to the Tao Insureds.

19   4.   The Tao Insureds suffered, and continue to suffer, substantial financial losses

20   because of SARS-CoV-2, COVID-19, the subsequent actions and orders of government authorities,

21   the need to comply with guidance from the Centers for Disease Control and Prevention, and the

22   need to its mitigate losses and damages.  As a result of these closures and suspensions, the Tao

23   Insureds suffered, and continue to suffer, financial losses in the hundreds of millions of dollars, with

24   a substantial portion of those losses coming from its Las Vegas venues.

25   5.   All told, the venues have largely been closed or at reduced capacities for nearly a

26   year.  In addition to their ongoing revenue loss, the Tao Insureds have incurred and will continue to

27   incur significant costs to ensure the health and safety of their employees, customers, and everyone

28

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

associated with or who walks into an insured location.  These mitigation efforts are necessary, expensive, and should be covered by the broad insurance sold by Employers to the Tao Insureds.

6.     The Tao Insureds turned to Employers for the insurance Employers promised to provide and that the Tao Insureds reasonably expected to receive in exchange for the millions of dollars in premiums they paid for this coverage.  After all, the Policy was marketed as providing "broad, comprehensive property protection" supported by a claims philosophy of getting "customers up and running as quickly as possible, mitigat[ing] losses (including business interruption), and clos[ing] claims quickly with the best possible outcome." Instead of honoring its obligations, however, Employers has paid nothing for Tao's losses, thereby depriving the Tao Insureds of the coverage to which they are entitled to under the Policy.

7.     The Tao Insureds are informed and believe, and on that basis allege, that Employers has taken, and is taking, a similar position with other insureds, having adopted corporate-wide positions that deprive the Tao Insureds and thousands of other insureds of hundreds of millions of dollars of promised insurance.  The Tao Insureds are informed and believe, and on that basis allege, that Employers has done so, and is doing so, to protect its financial interests at the expense of its insureds' interests and with conscious disregard and disdain for the rights, interests, and reasonable expectations of its insureds, including the Tao Insureds.

8.     Employers' conduct constitutes a breach of the insurance policy, violates NRS 686A.310, and is a breach of the covenant of good faith and fair dealing.  By this lawsuit, the Tao Insureds seek recovery for their damages, including consequential damages, that it continues to suffer.  The Tao Insureds also seek declaratory relief confirming that Employers must honor the terms of the Policy.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on complete diversity of the parties and an amount in controversy exceeding $75,000, exclusive of interests and costs.

10.     Employers agreed in the Policy that "[a]ny disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States."  Policy, § I.H.

T023.001/314958.9

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the events and omissions giving rise to the claim occurred within the District.  This includes the fact that there are a number of insured locations in Las Vegas, and these locations have incurred financial losses in the tens of millions of dollars.

## THE PARTIES

12.     Tao Group Holdings, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York, New York.  Tao's members are citizens of California, Connecticut, Delaware, Illinois, Nevada, New Jersey, New York, and Texas.

13.     Tao is informed and believes, and on that basis alleges, that Employers is incorporated under the laws of the State of Wisconsin and has its principal place of business in Boston, Massachusetts.  At all times material hereto, Employers was licensed to transact, and did transact, business in Nevada and Clark County.

14.     Tao is informed and believes, and on that basis alleges, that Employers is a wholly owned subsidiary of Liberty Mutual Group, Inc., which is a wholly owned subsidiary of LMHC Massachusetts Holdings, Inc., which is a wholly owned subsidiary of Liberty Mutual Holding Company, Inc.[1]  All are, and hold themselves out as being, members of the Liberty Mutual Holding Company (collectively, "Liberty").  Liberty makes statements and representations to the public and its insureds on its website, https://www.libertymutualgroup.com/about-lm/corporate-information/overview.  Liberty uses its website to market its insurance products; represent the nature of its insurance products, its policy underwriting, and its claims handling; and represent the quality of insurance and service its customers will get if they do business with Liberty.

15.     Liberty has represented, and represents, to the public:

> Since 1912, we've grown our organization into the sixth largest global property and casualty insurer - based on 2019 gross written premium - by maintaining our commitment to the belief that progress happens when people feel secure.  At Liberty Mutual Insurance we work hard

---

[1] https://oci.wi.gov/Documents/Companies/FinEmpWausau.pdf;
https://www.mass.gov/doc/liberty-mutual-insurance-company-3/download?_ga=2.164466038.834909683.1613954493-2009748337.1613954493.

**COMPLAINT AND JURY DEMAND**

1  every day to support our customers and our people, so they can protect
2  their families, build their businesses and invest in their futures.[2]

3     16.    Liberty has long represented to the public and its customers, including Tao, that it

4  has special expertise in providing insurance to companies and individuals in business.  For instance,

5  touting its experience in the corporate realm, Liberty states the following on its website:

6  If a major storm or fire destroys your shop and inventory scheduled
7  for delivery, you want to be confident that your business can recover
  with as little disruption as possible.  With property insurance from
8  Liberty Mutual Insurance, you can protect your business space as well
  as its contents.  You can even elect to cover lost income or additional
9  expenses incurred while your business is closed.[3]

10     17.    On its website, Liberty states "**We're Here to Help**":

11  At Liberty Mutual, being there for people when they need us most is
  what we've been doing for more than a century.
12

13  During this uncertain time, the health and well-being of our
  employees, customers, partners and the communities where we live
14  and work are our primary concern during the global coronavirus
  (COVID-19) pandemic.

15  On behalf of the entire Liberty Mutual community, our sincere and
16  heartfelt thoughts go out to the people whose lives have been
  impacted by the coronavirus.  We extend our deepest appreciation to
17  the healthcare professionals working tirelessly to care for patients and
  to keep our communities safe, and to all other essential workers who
18  are also leaving their own families day in and day out to keep key
  services running.  We are truly grateful.[4]

19     18.    Indeed, Liberty itself has undertaken steps in connection with its in-person events to

20  protect against the spread of SARS-CoV-2 and COVID-19:

21  We're committed to living our Value of putting people first by
22  helping relieve some of our employees' stress and providing the
  flexibility they need to balance their work and family during this time.
23  As we take a phased approach to re-opening our offices, we'll be
  thoughtful and flexible in our decisions, guided by our own
  employees' sentiment, local risk, government guidance and other
24  factors.  When we do invite employees back, we'll implement the

25  ---

[2] https://www.libertymutualgroup.com/about-lm/corporate-information/our-business.

26  [3] https://business.libertymutualgroup.com/business-insurance/coverages/property-insurance-policy.

27  [4] https://www.libertymutualgroup.com/about-lm/corporate-information/how-were-responding-
coronavirus-covid-19.

28

T023.001/314958.9

necessary safety measures and working virtually will remain an option throughout the COVID-19 crisis.[5]

19.     Liberty proclaims the following on its website with respect to COVID-19:

> At Liberty Mutual, the well-being of our customers and employees is always our top priority.  From issuing refunds to our customers, to providing payment flexibility, to issuing grants for community partners responding to coronavirus, we're here to help in tough times, as we've done for over 100 years.[6]

20.     The Tao Insureds are informed and believe, and on that basis allege, that despite these promises and assurances, Employers never intended to honor its contractual obligations with respect to losses associated with the pandemic.

21.     In its fourth-quarter 2019 financial statement, Liberty explained that the company provides coverage for catastrophic events:

> The Company writes insurance and reinsurance contracts that cover catastrophic events, both natural and man-made.[7]

22.     Liberty further explained:

> Catastrophes are an inherent risk of the property-casualty insurance business and have contributed to material period-to-period fluctuations in the Company's results of operations and financial position.  Catastrophe losses are severe losses resulting from natural and man-made events, including risks such as fire, earthquake, windstorm, explosion, terrorism, and other similar events.  The extent of losses from a catastrophe is a function of both the total amount of insured exposure in an area affected by the event and the severity of the event.[8]

## EMPLOYERS' KNOWLEDGE OF THE RISK OF PANDEMICS

23.     The Tao Insureds are informed and believe, and on that basis allege, that by the time that Employers sold the Tao Insureds the Policy, it had known for over a decade that there were standard-form exclusions available in the insurance marketplace that could exclude coverage for

---

[5] *Id.*

[6] https://www.libertymutual.com/covid-19.

[7] https://www.libertymutualgroup.com/about-lm/investor-relations/documents/q4-2019-financial-statements.pdf.

[8] *Id.*

T023.001/314958.9

PASICH

losses caused by viruses and pandemics, that other insurers had included such exclusions in policies that they sold, and, in fact, that Employers' sister companies regularly sold policies to other insureds that included such exclusions.   *See*, *e.g.*, *Long Affair Carpet and Rug, Inc. v. Liberty Mutual Ins. Co.*, Case No.: SACV 20-01713-CJC (JDex), 2020 WL 6865774 (C.D. Cal. Nov. 12, 2020) (containing an exclusion tracking the language of the "**Exclusion Of Loss Due To Virus or Bacteria**" Endorsement"); *Meyer Natural Foods, LLC v. Liberty Mutual Fire Ins. Co.*, 218 F. Supp. 3d 1034, 1037-38 (D. Neb. Nov. 22, 2016) (containing a "Pandemic Exclusion" – referencing "any epidemic, pandemic, influenza, plague, SARS, or Avian Flu").

24.     Employers and other insurers were repeatedly warned over the years of the potential impact of pandemics.   In fact, there were many publicly available reports about the risks of pandemics and what insurers should do—in the months and years before the outbreak of the COVID-19 pandemic.

25.     One insurance industry repository shows the "tip of the iceberg" about how much information was available to Employers and other insurers regarding the risk of pandemics.   The Insurance Library Association of Boston, founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests."[9]   The Association states on its website:

> The past 20 years [have] seen the rise of a number of pandemics. Slate recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well.[10]

26.     The Association lists more than 20 articles, reports, and white papers available to insurers from early 2007 through 2018.   One white paper warned in 2009 of a pandemic's consequences to the insurance industry:

---

[9] https://insurancelibrary.org/about/.

[10] http://insurancelibrary.org/pandemics-and-insurance/.

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

It is highly unlikely that the insurance industry would have the financial reserves to meet the worldwide claims arising out of a pandemic of this size.[11]

27. Indeed, in March 2018, one article stated:

Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet.[12]

28. Employers also has known, or should have known, for decades that its policies could be held to insure losses from the presence of a hazardous substance, such as a virus inside a building or in its airspace, or because a building could not be used for its intended purposes or function because of a virus. As Employers has known, or should have known, for decades many courts have held that the presence of a hazardous substance in property, including the airspace, surfaces and personal property inside buildings, constitutes property damage and that there may be "direct physical loss" to property even if the property is not tangibly damaged. As Employers has known, or should have known, the many decisions include the following:

• *JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Insurance Co.*, 2020 WL 7190023, at *3 (Nev. Dist. Ct. Nov. 30, 2020): denying insurer's motion to dismiss because the insured included allegations that SARS-CoV-2 "spreads through infected droplets that 'are physical objects that attach to and cause harm to other objects' based on its ability to 'survive on surfaces' and then infect other people," along with the actual presence within one mile from the insured physical premises.

• *Wakefern Food Corp. v. Liberty Mutual Fire Insurance Co.*, 968 A.2d 724, 734-5 (N.J. App. Div. 2009): holding that the electrical grid was 'physically damaged' when it was "incapable of performing [its] essential function of providing electricity", further noting that "the undefined term 'physical damage' was ambiguous" and that "[s]ince 'physical' can mean

---

[11] "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/.

[12] *Id.*

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

more than material alteration or damage, it was incumbent on the insurer to clearly and specifically rule out coverage in the circumstances where it was not to be provided."

- *Arbeiter v. Cambridge Mutual Fire Insurance Co.*, 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996):  presence of oil fumes in building constituted "physical loss" to building.

- *Essex Insurance Co. v. BloomSouth Flooring Corp.*, 562 F.2d 399, 406 (1st Cir. 2009):  odor from carpet and adhesive "can constitute physical injury to property."

- *Farmers Insurance Co. v. Trutanich*, 123 Or. App. 6, 9-11 (1993): "[T]he odor produced by the methamphetamine lab had infiltrated the house.  The cost of removing the odor is a direct physical loss."

- *Gregory Packaging, Inc. v. Travelers Property Casualty Co.*, 2014 WL 6675934 (D.N.J. Nov. 25, 2014):  closure of facility because of accidentally released ammonia; while "structural alteration provides the most obvious sign of physical damage, . . . property can sustain physical loss or damage without experiencing structural alteration."

- *Hughes v. Potomac Ins. Co.*, 199 Cal. App. 2d 239, 248-49 (1962): The insurer "would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected.  Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner."

- *Matzner v. Seacoast Insurance Co.*, 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998): building with unsafe levels of carbon monoxide sustained direct physical loss.

- *Mellin v. North Security Insurance Co.*, 167 N.H. 544, 550-51 (2015): cat urine odor inside condominium constitutes direct physical loss; "physical loss may include not only tangible changes to the insured property, but also changes that are perceived by a sense of smell and that exist in the absence of structural damage."

- *Oregon Shakespeare Festival Ass'n v. Great American Insurance Co.*, 2016 WL 3267247, at *9 (D. Ore. June 7, 2016): "smoke infiltration in theatre caused direct property loss or damage by causing the property to be uninhabitable and unusable for its intended purpose."

9

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

- *Pepsico, Inc. v. Winterthur International American Insurance Co.*, 24 A.D.3d 743, 744 (2d Dep't 2004): rejecting insurer's contention that products altered because of faulty ingredients were not physically damaged under an all-risk property policy.

- *Port Authority of New York & New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226, 236 (3d Cir. 2002):   property sustained a direct physical loss because it was rendered uninhabitable by the presence of asbestos fibers.

- *Western Fire Insurance Co. v. First Presbyterian Church*, 165 Colo. 34, 39-40 (1968): direct physical loss when gasoline permeated church building making it dangerous to use.

29.     Thus, Employers knew, or should have known, for decades that its policies would be called upon to pay substantial amounts, including to the Tao Insureds, for losses associated with viruses, the diseases they cause, and pandemics.

30.     Given the potential liability that insurers faced under their policies for losses from pandemics, shortly after the outbreak of SARS in 2003, the insurance industry undertook to draft exclusions applicable to losses from viruses and bacteria.  In 2006, the Insurance Services Office ("ISO"), the insurance industry's drafting organization, considered the need to draft an exclusion that would bar coverage for certain losses caused by a virus.[13]

31.     On July 6, 2006, ISO prepared a circular that included a standard "**Exclusion Of Loss Due To Virus Or Bacteria**" as part of its filing with state insurance regulators.[14]   ISO explicitly recognized that viruses could cause property damage and business interruption:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.

---

[13] "ISO is a non-profit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645,671 n.13 (1995).

[14] *See ISO* Circular, "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/wp-includes/ms-files.php?file=2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf
.

**COMPLAINT AND JURY DEMAND**

> When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.[15]

32.     ISO introduced the insurance industry's standard-form endorsement that it entitled "**Exclusion Of Loss Due To Virus Or Bacteria**" endorsement (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).  A true and correct copy of this endorsement is attached hereto as Exhibit 1 and incorporated herein by reference.  Thus, Employers has had the "**Exclusion Of Loss Due To Virus Or Bacteria**" endorsement approved for use and available to them throughout the United States for 13 years before they sold the Policy to the Tao Insureds.

33.     Likewise, the Liberty's RM Select Policy form, RM1003, at least as of February 2011, contained an exclusion (the "Pandemic Exclusion") purporting to exclude:

> The actual or suspected presence or threat of any virus, organism or like substance that is capable of inducing disease, illness, physical distress or death, whether infectious or otherwise, including but not limited to any epidemic, pandemic, influenza, plague. SARS or Avian Flu.

*See* Exhibit A to the Complaint (Policy), in *Meyer Natural Foods, LLC v. Liberty Mutual Fire Ins. Co.*, Civil Action No. 8:15-CV-3116 (ECF No. 1-1, Filed September 28, 2015), at GOP 000241. Thus, Employers has the "Pandemic Exclusion" in use and available to them throughout the United States for at least 8 years before they sold the Policy to the Tao Insureds.

34.     However, even though Employers knew it could be liable for losses from viruses and pandemics if they did not include the "**Exclusion Of Loss Due To Virus Or Bacteria**" in its Policy, Employers still sold the Policy to the Tao Insureds without such an exclusion. Therefore, Employers did not intend to (and did not) exclude such coverage and should have anticipated that it would be liable once the Tao Insureds asked Employers to pay for their losses.

## ADVERTISING THE PREMIER PROPERTY PROTECTOR POLICY

35.     Well before selling the Policy to the Tao Insureds, Employers and its sister companies made broad representations to the public and to its actual and potential insureds about the "Premier Property Protector" form that was included in the Policy.

---

[15] *Id.*

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

36.     As part of the marketing materials, Employers and its sister companies advertised the Premier Property Protector form's "All-Risk Flexibility" and stating that, "With almost 50 embedded coverages, we offer broad, comprehensive property protection that companies expect in a single policy." A copy of one such advertisement is attached hereto as Exhibit 2 and incorporated by reference.

37.     The advertising also promoted the "Easy-to-Use Structure and Language" of the Premier Property Protector form as follows:

> Simplified language and structure make Premier Property Protector the easiest-to-use commercial property form – ever. Improvements, such as placing limits and deductibles in the Declarations, provide an up-front and comprehensive view of the overall insurance program.[16]

38.     In addition, this advertising highlighted "Property Claims Expertise," in connection with the Premier Property Protector form, as one of the benefits "Beyond the Policy." To wit:

> Our property claims philosophy is to get customers up and running as quickly as possible, mitigate losses (including business interruption), and close claims quickly with the best possible outcome.[17]

## THE POLICY

39.     Employers sold the Tao Insureds the Policy utilizing the Premier Property Protector form, Policy No.YAC-L9L-470694-019, for the period of July 1, 2019 to July 1, 2020. A true and correct copy of the Policy is attached hereto as Exhibit 3 and incorporated herein by reference.

40.     The "Named Insured" in the Policy is listed as "Tao Group Holdings, LLC and any subsidiary, and the interest of Tao Group Holdings, LLC in any partnership or joint venture in which Tao Group Holdings, LLC has management control, ownership, or is obligated to insure, as now constituted or hereafter acquired, as the respective interest of each may appear…" Policy, § I.A.

41.     The Policy states that: "Loss will be adjusted with the First Named Insured" and that "[s]uch loss will be payable to the First Named Insured or as may be directed by the First Named Insured." *Id.*, § VI.F.

---

[16] https://business.libertymutualgroup.com/business-insurance/Documents/Coverages/CI3423PremierPropertyProtectorPH.FINAL.pdf.

[17] *Id.*

**COMPLAINT AND JURY DEMAND**

42.     The Policy is an "all risk" property insurance policy—that is, a policy that insures all risks of direct physical loss or damage except those conspicuously, plainly, clearly, and expressly excluded.  *Id.*, § I.C (Employers "cover property, as described in this Policy, against all risks of direct physical loss or damage, except as hereinafter excluded or limited, while located as described in this Policy").

43.     In fact, Employers knew from decades of uniform court decisions from around the country that any exclusion needed to be conspicuous, plain, and clear, employing unmistakable and understandable language and that if they elected not to use such language, the purported exclusions would not be enforceable against the Tao Insureds.  The decisions putting them on such notice include *Steven v. Fidelity & Casualty Co. of New York*, 58 Cal. 2d 862, 877-78 (1962), and *Westview Associates v. Guaranty National Ins. Co.*, 95 N.Y. 2d 334, 340 (2000).

44.     The Policy insures, among other things, Tao's interests in the real and personal property identified in Appendix A – Schedule of Covered Locations.  *Id.*, Appendix A.

45.     The Policy also insures, among other things, "Miscellaneous Unnamed Locations" which means locations "owned, leased or rented by [the Tao Insureds] but not listed in a Schedule of locations on file with us or attached to this Policy., *Id.*§ VII.12.

46.     The Policy is comprised of forms and endorsements that define the scope of coverage.  Like most commercial property insurance policies, the Policy insures not only against physical loss or damage to covered property (Policy, § II.A), but also for resulting economic and financial losses.  *Id.*, § III. Time Element.  In the Policy, these coverages are referred to as "Time Element Coverages."  *Id.*  The Policy contains a per occurrence policy limit of $250,000,000, with a sublimit of $122,372,531 for "Time Element."  *Id.*, Limits of Liability Table.

47.     Per the Policy:

> Words in bold face type have special meanings in this Policy and are defined in the DEFINITIONS section of this Policy.  These definitions apply to this entire Policy and to any endorsements to it. Definitions that apply to individual sections or paragraphs are italicized and defined in the applicable sections or paragraphs.

*Id.*, § I.J, Defined Words.

T023.001/314958.9

48.     "Occurrence," for example, is defined as "All loss or damage attributable directly or indirectly to one (1) cause or series of similar causes.  All such loss or damage will be added together and the total loss or damage will be treated as one (1) occurrence." *Id.*, § VII.13.

**Time Element Coverages**

49.     The Policy's Time Element Coverages are designed, understood, stated, and intended to insure the Tao Insureds for economic losses.  Specifically, Employers promised to:

> [C]over your actual loss sustained, as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGES AND LIMITATIONS, directly resulting from a loss of the type insured by this Policy:
>
> a. To property described elsewhere in this Policy and not otherwise excluded by this Policy;
>
> b. Used by you, or by others with whom you have a contract;
>
> c. At a covered location or while in transit as provided by this Policy,
>
> d. During the applicable PERIOD OF LIABILITY described in this section.

*Id.*, § III.A.1.

50.     Although, as noted above, words in bold face type are expressly defined in the Policy, the Policy fails to define the phrase "direct physical loss or damage" in the Policy.

51.     The Policy also provides "Extra Expense" coverage, obligating Employers to pay the Tao Insureds' "reasonable and necessary extra costs" during the period of liability to "temporarily continue as nearly normal as practicable the conduct of **your** business . . . ."  *Id.*, § III.B.2.a.

52.     **Your** is defined as "[t]he First Named Insured shown on the Declarations."  *Id.*, § VII.20.

**Attraction Property Coverage**

53.     The Policy provides Attraction Property coverage.   This coverage obligates Employers to pay the Tao Insureds' "actual loss sustained and EXTRA EXPENSE resulting from loss or damage of the type insured at an *attraction property*" within 1 mile.  *Id.*, § III.E.1.a (italicized term in original).

14

**COMPLAINT AND JURY DEMAND**

54.     Attraction Property Coverage:

    (1)  starts at the time such physical loss or damage happens;

    (2)  ends when the *attraction property* is:

        (a) repaired and replaced; and

        (b) made ready for operations.

*Id.*

55.     An "attraction property" is a property that is operated by others and that the Tao Insureds depends on to attract customers to the Tao Insureds' venues. *Id.*, § III.E.1.b.

### Civil or Military Authority Coverage

56.     The Policy provides Civil or Military Authority coverage.  This coverage obligates Employers to pay the Tao Insureds' "actual loss sustained and EXTRA EXPENSE during the *period of interruption* if an order of civil or military authority prohibits access to a covered location provided such order is caused by physical loss or damage of the type insured by this Policy at a covered location or within" 1 mile. *Id.*, § III.E.2.  The coverage extends 30 consecutive days, not to exceed $500,000 per occurrence. *Id.*, Limits of Liability Table – Part One.

### Contingent Time Element Coverage

57.     The Policy provides Contingent Time Element coverage.  This coverage obligates Employers to pay the Tao Insureds' "actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured by this Policy at *Direct Dependent Time Element Location(s)* . . . ." *Id.*, § III.E.4.a.

58.     *Direct Dependent Time Element Location(s)* refer to any locations of a direct customer, supplier, contract manufacturer or contract service provider to the Tao Insureds. *Id.*, § III.E.4.c.

### Ingress/Egress Coverage

59.     The Policy provides Ingress/Egress coverage that obligates Employers to pay the Tao Insureds':

> actual loss sustained and EXTRA EXPENSE due to the necessary interruption of your business if ingress to or egress from a covered location is prevented, whether or not your premises or property is

15

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

damaged, provided that such prevention is a direct result of physical loss or damage of the type insured to property of the type insured.

*Id.*, § III.E.8. The coverage extends up to 30 consecutive days, not to exceed $25,000 per occurrence.  *Id.*, Limits of Liability Table – Part One.

### Professional Fees Coverage

60.    The Policy provides Professional Fees Coverage.   This coverage obligates Employers to pay the Tao Insureds' "reasonable costs for [Tao's] employees or auditors, architects, accountants and engineers whom you hire to prepare and verify the details of a claim from a covered loss."  *Id.*, § II.D.19.   The Professional Fees entitles the Tao Insureds to $100,000 per occurrence.  *Id.*, Limits of Liability Table – Part One.

### Exclusions

61.    The Policy contains numerous coverage exclusions.   Section II, C. Exclusions, for example, contains five pages of losses that are purportedly excluded.   The preamble to this section, however, provides that the referenced exclusions "apply unless otherwise stated in this Policy."  *Id.*, § II.C.

62.    The Policy does not contain the "**Exclusion Of Loss Due To Virus Or Bacteria**" endorsement.   Nor does the Policy contain any exclusion relative to a pandemic or any other exclusion that conspicuously, plainly, clearly, and unambiguously applies to the losses claimed by the Tao Insureds for the damages that they have suffered and continue to suffer.

63.    Employers decided in selling the Policy to the Tao Insureds not to use the "**Exclusion Of Loss Due To Virus Or Bacteria**" endorsement, which would have been prominently identified on the Policy's declaration pages as a virus exclusion, and would be a separate endorsement clearly entitled a virus exclusion.  Instead, the Tao Insureds have now learned that Employers decided to use an unnamed exclusion in the same small print as most of their policies that purport to bar coverage for "contamination" claims.  *Id*., § II.C.4.a.  This exclusion purports to bar coverage for "**Contamination**, and any cost due to **contamination**[.]"  *Id.*  However, Employers did not define "contamination" in the exclusion, nor give any indication in the exclusion itself that coverage for "viruses" is expressly excluded.  Nothing in this exclusion would inform a reasonable person that it

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

1   somehow could be construed to deny coverage for losses associated with SARS-CoV-2 or COVID-

2   19.

3         64.    The only way for an insured to discover that "virus" somehow fell within the scope

4   of the contamination exclusion would be for the insured to search the rest of the policy.  If an insured

5   did so, it might find a definition of "contamination" nearly 40 pages later.  That definition states that

6   **contamination** is "[a]ny condition of property that results from a contaminant."  Policy § VII.4.

7   **Contaminant** is then defined as "Any foreign substance, impurity, pollutant, hazardous material,

8   poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing

9   agent, fungus, mold or mildew." *Id.*, § VII.3.

10         65.    This form of an exclusion referring generically to "virus" without being in an

11   exclusion properly identified and referenced as a "Virus Exclusion" has been referred by academic

12   commentators as a "hidden virus exclusion."[18]  It is the opposite of the conspicuous, plain, and clear

13   exclusion as required by governing law in order to deny coverage.  Therefore, it is not enforceable

14   against the Tao Insureds even if it otherwise applied to limit coverage.  Furthermore, its application

15   to bar coverage for the Tao Insureds' losses would be contrary to public policy, would result in an

16   unjust forfeiture of coverage for the Tao Insureds, and would result in unjust enrichment to

17   Employers, rewarding them for hiding the exclusion rather than using the more conspicuous, plainer,

18   and clearer "**Exclusion Of Loss Due To Virus Or Bacteria**" Endorsement.

19   **THE COVID-19 PANDEMIC AND**

20   **SUBSEQUENT CIVIL AUTHORITY ORDERS**

21         66.    In December 2019, SARS-CoV-2 and COVID-19 broke out in Wuhan, China.  Since

22   then, SARS-CoV-2 and COVID-19 have spread throughout the world, prompting the World Health

23   Organization to declare a global pandemic.

24         67.    According to the World Health Organization,

25           COVID-19 is caused by the SARS-CoV-2 virus, which spreads

26           between people, mainly when an infected person is in close contact
        with another person.

27

28   [18] https://cclt.law.upenn.edu/category/litigation-strategy/.

17

**COMPLAINT AND JURY DEMAND**

PASICH

The virus can spread from an infected person's mouth or nose in small liquid particles when they cough, sneeze, speak, sing or breathe heavily.  These liquid particles are different sizes, ranging from larger 'respiratory droplets' to smaller 'aerosols'.

Other people can catch COVID-19 when the virus gets into their mouth, nose or eyes, which is more likely to happen when people are in direct or close contact (less than 1 metre apart) with an infected person.

Current evidence suggests that the main way the virus spreads is by respiratory droplets among people who are in close contact with each other.

Aerosol transmission can occur in specific settings, particularly in indoor, crowded and inadequately ventilated spaces, where infected person(s) spend long periods of time with others, such as restaurants, choir practices, fitness classes, nightclubs, offices and/or places of worship.   More studies are underway to better understand the conditions in which aerosol transmission is occurring outside of medical facilities where specific medical procedures, called aerosol generating procedures, are conducted.

The virus can also spread after infected people sneeze, cough on, or touch surfaces, or objects, such as tables, doorknobs and handrails. Other people may become infected by touching these contaminated surfaces, and then touching their eyes, noses or mouths without having cleaned their hands first.[19]

68.     Various publications report that aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in air and infective for 16 hours, until gravity ultimately forces them to the nearest surface.[20]   Studies report that SARS-CoV-2 can remain on surfaces for at least 28 days.[21]   These droplets thus physically alter the air and airspace in which they are present and the surfaces of both the real and personal property to which they attach.  By doing so, despite taking the most reasonable of precautions and mitigation measures, they can render

---

[19] *See* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted.

[20] *See* Leslie Tate, *Virus Survives In Air For Hours,* Tulanian (Fall 2020), https://tulanian.tulane.edu/fall-2020/virus-survives-in-air-for-hours.

[21] *See, e.g.,* CNBC, *Virus that causes Covid-19 can survive for 28 days on common surfaces, research says* (Oct. 12, 2020), https://www.cnbc.com/2020/10/12/virus-that-causes-covid-19-can-survive-for-28-days-on-surfaces-research-says.html; Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles, & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7.

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

both real and personal property unusable for its intended purpose and function and may require steps to be taken to minimize their spread, such as physical distancing, regular disinfection, air filtration, and further physical alterations, such as installation of physical barriers restricting the movement of the aerosolized droplets.

69.     Though microscopic, SARS-CoV-2—like all viruses—is a physical substance. SARS-CoV-2 is highly contagious and mobile.  Even with reasonable efforts to slow the spread, it spreads from person to person primarily through fine aerosolized droplets containing the virus. These aerosolized droplets are expelled into the air when infected individuals breathe, talk, sing, cough, or sneeze.  Their presence in the air and airspace constitutes a physical alteration to the air and airspace, constituting physical damage.

70.     Scientists have likened the ubiquitous aerosolized droplets of the virus to smoke, present in the air long after the source of its dissemination has gone.[22]   Thus, absent proper safety precautions and protocols, entering a building or other location where SARS-CoV-2 may be physically present in the air can pose an imminent and severe risk to human health.

71.     Since January 1, 2020, and as of the date of the filing of this Complaint, there have been at least 115.6 million confirmed cases of COVID-19 throughout the world, at least 2.5 million of which have resulted in deaths.[23]   There have been at least 28.8 million confirmed cases of COVID-19 in the United States, at least 520,028 of which have resulted in deaths.[24]  Moreover, due in part to the initial absence of available tests, it is believed that the true number of coronavirus cases is significantly higher than the reported numbers might suggest.[25]

---

[22] *See* "Airborne Transmission of SARS-CoV-2," *Science* (Oct. 16, 2020), available at https://science.sciencemag.org/content/370/6514/303.2.

[23] *See* https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html.

[24] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[25] *See* https://www.nbcnews.com/health/  health-news/how-many-people-have-had-coronavirus-no-symptoms-n1187681.

**COMPLAINT AND JURY DEMAND**

72.     In Nevada, alone, there have been more than 295,179 confirmed cases of COVID-19, more than 5,005 of which have resulted in deaths.[26]  Moreover, due in part to the initial absence of available tests, it is believed that the true number of coronavirus cases is significantly higher than the reported numbers might suggest.[27]  On March 12, 2020, the positive test rate in Nevada was 7.1% after 146 people were tested for COVID-19.[28]  However, on May 1, 2020, the Nevada Department of Health and Human Services reported 229 new cases of COVID-19, "the biggest one-day increase in more than three weeks.  The new cases raised the total in the state to 5,227[.]"[29] These statistics were derived from "tests on 43,595 people, representing an infection rate of 11.99 percent of those tested."  *Id*.  "The infection rate was only slightly higher than the 11.90 percent infection rate reported on [April 30, 2020], suggesting that the increase of tests to 2,082 from the 1,235 reported a day earlier was largely responsible."  *Id*.

73.     In New York, there have been more than 1,600,000 confirmed cases in the State of New York, more than 47,000 of which have resulted in deaths.  Moreover, due in part to the initial absence of available tests, it is believed that the true number of coronavirus cases is significantly higher than the reported numbers might suggest.[30]  "Citywide, the percentage of tests with positive results increased from 27% the week of March 8 to a peak of 65% during the week of March 22. The growth of testing rates lagged behind the growth of percent positivity but increased steadily from 86 per 100,000 during the week of March 8 to 1,634 per 100,000 by the week of May 24."[31]

74.     The prevalence of SARS-CoV-2 and the lack of availability of widespread testing resulted in civil authorities prohibiting or limiting the use and operations of the Tao Insureds' restaurants, bars, lounges, nightclubs and dayclubs.  Even as the virus transmission rate has abated,

---

[26] https://www.nytimes.com/interactive/2020/us/nevada-coronavirus-cases.html.

[27] https://www.nbcnews.com/health/health-news/how-many-people-have-had-coronavirus-no-symptoms-n1187681.

[28] https://www.nytimes.com/interactive/2020/us/nevada-coronavirus-cases.html; https://covidactnow.org/us/nevada-nv/?s=1637578.

[29] https://www.reviewjournal.com/news/politics-and-government/nevada/more-tests-may-be-behind-jump-in-clark-county-nevada-covid-19-cases-2018753/.

[30] *See* https://www.nytimes.com/2020/07/21/health/coronavirus-infections-us.html.

[31] https://www.cdc.gov/mmwr/volumes/69/wr/mm6946a2.htm.

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

vaccines have begun to be provided and testing has become more widely available, civil authorities have continued to prohibit or limit the use and operations of restaurants, bars, lounges, nightclubs and dayclubs.

75.     Since the outbreak of SARS-CoV-2 and COVID-19, and in response thereto, civil authorities throughout the world issued "stay-at-home" and "shelter in place" orders, travel restrictions, quarantines, and other orders, including orders requiring the suspension of non-essential business operations.

76.     The Tao Insureds' California properties[32] were, and continue to be, impacted by a number of civil authority orders and actions, including:  Executive Department State of California Executive Order Nos. N-25-20 and N-33-20; the March 16, 2020, guidance issued by the California Department of Public Health ("CDPH") titled "Coronavirus Disease 2019 (COVID-19) and Retail Food, Beverage, and Other Related Service Venues"; the March 19 and May 7, 2020, Orders of the State Public Health Officer issued by the CDPH; the May 19, 2020, update on the Official California State Government Website titled "County Variance;" the June 5, 2020, and "COVID-19 Industry Guidance: Restaurants, Bars, and Wineries."

77.     Particularly, the "Public Order Under City of Los Angeles Emergency Authority," issued March 15, 2020 by the Mayor of the City of Los Angeles, references the "COVID-19 virus" and concern regarding "person-to-person" spread.   To protect "life and property," the Mayor ordered:

> 2.  Any bars or nightclubs in the City of Los Angeles that serve food may remain open only for purposes of continuing to prepare and offer food to customers via delivery service or to be picked up.  Dine-in food service is prohibited.
> 3.  All restaurants…in the City of Los Angeles shall be prohibited from serving food for consumption on premises."[33]

78.     The Tao Insureds' Illinois properties[34] were, and continue to be, impacted by a number of civil authority orders and actions, including: Illinois Governor JB Pritzker's March 9,

---

[32] *See* Policy, Appendix A – Schedule of Locations.

[33] https://www.lamayor.org/sites/g/files/wph446/f/article/files/Mayor%20Garcetti%20Emergency%20Order%20-%20March%2015%202020.pdf.

[34] *See* Policy, Appendix A – Schedule of Locations.

21
**COMPLAINT AND JURY DEMAND**

2020, Gubernatorial Disaster Proclamation; Illinois Governor Pritzker's Executive Orders 2020-04, 2020-07, 2020-10, 2020-18, 2020-32, 2020-33, and 2020-38, .

79.     On April 1, 2020, for example, Illinois Governor JB Pritzker issued a Gubernatorial Disaster Proclamation because "the circumstances surrounding COVID-19 have resulted in the occurrence and threat of widespread and severe damage, injury, and loss of life and property under Section 4 of the Illinois Emergency Management Agency Act."[35]

80.     The Tao Insureds' New York properties[36] were, and continue to be, impacted by a number of civil authority orders and actions, including: New York Governor Andrew Cuomo's Executive Order No. 202 declaring a Disaster Emergency in the State of New York, Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.18, 202.31, 202.33, 202.34, 202.35, 202.38, 202.39, 202.41, 202.45, 202.47, 202.48, 202.51, and 202.53; and Governor's Executive Order 205 placing quarantine restrictions on travelers arriving in New York.

81.     On March 16, 2020, Mayor De Blasio of the City of New York issued Emergency Executive Order No. 100, "because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage.[37]

82.     The Tao Insureds' Nevada[38] properties were, and continue to be, impacted by a number of civil authority orders and actions, including: COVID-19 Declaration of Emergency Directive Nos. 002, 003, 007, 010, 016, 018, 021, 024, 026, 027, 029, 030, 033, 035, 037; the March 20, 2020, "Emergency Regulation Defining Essential and Non-Essential Businesses"; the May 13, 2020, "Phase One Reopening: General Guidance"; the May 15, 2020, "COVID-19 Phase One Reopening- Industry-Specific Guidance (Revised)"; the August 3, 2020, "COVID-19 Road to Recovery: Moving to A New Normal"; and the November 24, 2020, "Nevada Statewide Pause."

---

[35] https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-19.aspx.

[36] *See* Policy, Appendix A – Schedule of Locations.

[37] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf.

[38] *See* Policy, Appendix A – Schedule of Locations, and 2019-2020 Schedule of Values on File with Employers.

**COMPLAINT AND JURY DEMAND**

83.     On March 12, 2020, for example, Nevada Governor Steve Sisolak declared a state of emergency in the state of Nevada citing the presence of COVID-19 and its impact on lives and property.[39]

84.     Moreover, on March 20, 2020, Nevada Governor Steve Sisolak signed Directive 003, declaring that all non-essential businesses and operations to close.[40]  After issuing the Directive, Governor Sisolak explained that these drastic shut down measures were necessary in light of "the ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate periods of time, [which] renders some property unusable" and contributes to "damage … and property loss."[41]

85.     These civil authority orders continue to limit, restrict, and prohibit partial or total access to the Tao Insureds' properties as a result of direct physical damage of the type insured by the Policy.

86.     The civil authority orders required the Tao Insureds to completely or partially suspend their business operations and prohibit access to their venues.

87.     The civil authority orders also impaired access to the Tao Insureds' above-referenced properties.  Indeed, the civil authority orders restricted or prohibited many patrons, would-be patrons, and other third parties from accessing or visiting the Tao Insureds' properties.

88.     Similarly, the civil authority orders impaired access to hundreds of Attraction Properties near the Tao Insureds' properties.  Specifically, the civil authority orders prohibited individuals from accessing or visiting certain Attraction Properties, such as Las Vegas casinos, and also restricted the number of individuals who could access or visit other Attraction Properties.  Many of these impacted Attraction Properties were located within one mile of the Tao Insureds' venues.  In fact, all of the Las Vegas venues are located inside of casinos.

---

[39] https://gov.nv.gov/News/Emergency_Orders/2020/2020-03-12_-_COVID-19_Declaration_of_Emergency/.

[40] https://gov.nv.gov/News/Emergency_Orders/2020/2020-03-20_-_COVID-19_Declaration_of_Emergency_Directive_003_(Attachments)/.

[41] https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/.

T023.001/314958.9

PASICH

89.     Furthermore, as a result of SARS-CoV-2, COVID-19, and/or the civil authority orders, ingress to and egress from certain of the Tao Insureds' establishments was significantly impaired.  For instance, ingress to the Tao Insureds' properties within Las Vegas casinos were impaired.  This lack of ingress resulted in substantial financial losses to Tao.

90.     Because SARS-CoV-2 causes a distinct, demonstrable, physical alteration to property, it constitutes "direct physical loss or damage" to property as that phrase is used in the Policy.

91.     Additionally, the presence or potential presence of SARS-CoV-2 at, on, and in insured property prevents or impairs the use of the property, thus constituting "direct physical loss" to property as that phrase is used in the Policy, even if it also did not constitute "damage" to property as that term is used in the Policy.

92.     Indeed, since mid-March 2020, the SARS-CoV-2 virus has been direct  ubiquitous throughout the country, causing physical loss, damage, and destruction to air, airspace, and other property, including the Tao Insureds' properties.

93.     The Tao Insureds are therefore informed and believe, and on that basis allege, that the SARS-CoV-2 virus has been present at its properties, or would have been present but for its efforts to reduce, prevent, or otherwise mitigate its presence on its properties.

94.     The Tao Insureds are aware of reported cases of COVID-19 at its properties—and, given the widespread nature of SARS-CoV-2 and COVID-19, it is safe to say that SARS-CoV-2 has been present at the Tao Insureds' properties at one time or another, or would have been present had the Tao Insureds not taken steps to reduce, prevent, or otherwise mitigate its presence on their properties.  The Tao Insureds have taken reasonable and necessary steps and incurred considerable expense to eliminate SARS-CoV-2 from their properties, prevent SARS-CoV-2 from entering their restaurants and clubs, and otherwise mitigate their losses—all as is expressly required in the Policy.

95.     The Tao Insureds are informed and believe, and on that basis allege, that SARS-CoV-2 has been present at numerous Attraction Properties in the vicinity of the Tao Insureds' properties.  Indeed, the Tao Insureds are aware of reported cases of COVID-19 at several Attraction

T023.001/314958.9

Properties within one mile of its properties, many of which resulted in Attraction Properties closing or substantially reducing operations for a varying periods of time.

96.     As SARS-CoV-2 and COVID-19 spread around the world, the Tao Insureds have suffered, and continue to suffer, loss and damage covered by the Policy in an amount to be established at trial.

## EMPLOYERS' BREACHES AND WRONGFUL CONDUCT

97.     On or about March 26, 2020, the Tao Insureds timely notified Employers of its losses.

98.     In its April 1, 2020 response, provided to Tao just four business days after Employers received the Tao Insureds' notice of loss, Employers ignored the Policy's grant of coverage for "direct physical loss or damage" and the Policy's coverage for such loss or damage and the economic losses resulting from covered "direct physical loss or damage."

99.     Instead, Employers denied its coverage obligations on the following grounds:

> The reported business interruption loss is the result of preventative measures pertaining to COVID-19 mandated by the government. The Time Element coverages available under your policy requires physical damage by a peril insured against. As there was no physical damage and contamination is an excluded peril, there is no coverage provided for your business interruption loss.

100.    Employer's letter failed to address coverage for "Attraction Properties," "Contingent Time Element," "Professional Fees," or mitigation costs.

101.    Contrary to Employer's position, coverage is triggered by physical loss in addition to damage. The Tao Insureds' losses, as described above, include both physical loss and damage. In addition, the Tao Insureds' losses have a number of causes and trigger a number of different insurance coverages that are not excluded in the Policy.

102.    As a result of the actual and/or potential presence of SARS-CoV-2 on and in its properties and the suspensions of its business operations, the Tao Insureds sustained "Property Damage" as defined in the Policy.

103.    Given the manner in which SARS-CoV-2 lingers in the air and on surfaces, and its manner of transmission, and the government's desire to "flatten the curve," the insured locations were not capable of being used for their essential functions. Accordingly, the civil authority orders

1  substantially impaired the properties, constituting "direct physical loss or damage" to those

2  properties.

3       104.    The Tao Insureds have also incurred Time Element losses, as defined in the Policy,

4  "directly resulting from a loss of the type insured by the Policy.  The Tao Insureds' losses were due

5  to the "necessary interruption of [Tao's] business."  These losses were caused by the presence of

6  SARS-CoV-2 on, in, or around property, the civil authority orders, or both.

7       105.    Likewise, the civil authority orders constitute orders by a civil authority that prohibit

8  access to the insured locations "caused by physical loss or damage of the type insured" as is required

9  to trigger Civil or Military Authority coverage.

10       106.    Also, as a result of the suspensions and curtailments of operations at its properties,

11  the Tao Insureds have incurred Extra Expense, as defined and used in the Policy.  These losses were

12  caused by the presence of SARS-CoV-2 on, in, or around property, the civil authority orders, or

13  both.

14       107.    Although never addressed by Employers, the Tao Insureds sustained loss and extra

15  expense "resulting from loss or damage of the type insured by [the] Policy to property of the type

16  insured at an *attraction property*," thereby triggering Attraction Property coverage.

17       108.    Although also never addressed by Employers, Tao sustained loss and extra expense

18  "directly resulting from loss or damage of the type insured by [the] Policy at *Direct Dependent Time*

19  *Element Location(s)*," thereby triggering Contingent Time Element coverage.

20       109.    Although also never addressed by Employers, the Tao Insureds are entitled to

21  reimbursement of  the "reasonable costs for [Tao's] employees or auditors, architects, accountants

22  and engineers whom [Tao hired] to prepare and verify the details of a claim from a covered loss,"

23  under the Professional Fees coverage.

24       110.    Additionally, the closures were necessary to prevent the spread of SARS-CoV-2.

25  The costs and losses associated with the closures therefore constitute reasonable costs incurred to

26  "protect the covered property from further damage."  Although also never addressed by Employers,

27  Employers are obligated to pay these amounts because the Tao Insureds' actions, in addition to

28

T023.001/314958.9

1  being required under the common law doctrine of mitigation, are covered because it protected the

2  property from further damage.

3     111. Although the Tao Insureds have sustained substantial losses falling squarely in

4  multiple Policy coverage grants, Employers failed and refused to acknowledge coverage for those

5  losses and refused to pay any portion of them, including the amounts the Tao Insureds have incurred,

6  and is incurring, to mitigate otherwise insured losses.

7     112. Furthermore, Employers denied the Tao Insureds' claim, incorrectly asserting that

8  the losses were not caused by direct physical loss or damage or due to the prohibition of access by

9  a civil authority.  Employers took this position even though all of the localities and states where Tao

10  Insureds have real property issued orders in response to the presence of SARS-CoV-2; even though

11  the orders – including those from the Governor of Nevada, the Governor of Illinois, the Mayor of

12  Los Angeles, and the Mayor of the City of New York – declared that SARS-CoV-2 was causing

13  property damage, and even though the presence of SARS-CoV-2 on or around real and personal

14  property and in the airspace amounts to "physical loss or damage" to property under the governing

15  rules of insurance policy interpretation.

16     113. The Tao Insureds are informed and believe, and on that basis allege, that Employers

17  contends that even though SARS-CoV-2 caused physical alterations to the air and airspace in which

18  it is present and to the surfaces to which it attaches, these physical alterations somehow do not

19  constitute "direct physical loss or damage" as that phrase is used in the in the Policy because the

20  physical alterations are not visible to the naked human eye.

21     114. The Tao Insureds are informed and believe, and on that basis allege that Employers

22  denied coverage, and continues to deny coverage, even though it has known for decades that its

23  Policy could be held to cover losses from the presence of a virus inside buildings, or because a

24  building could not be used for its intended purpose or function.

25     115. As pointed out above, the Tao Insureds are informed and believe, and on that basis

26  allege, that Employers has known for decades that the presence of hazardous substances, including

27  microscopic substances, on or in real and personal property have s been deemed to constitute

28  property damage.

27

**COMPLAINT AND JURY DEMAND**

116. At a minimum, in light of the court decisions cited herein and many others, Employers knew that its policy language reasonably could be interpreted to cover losses associated with pandemics and viruses. The Tao Insureds are informed and believe and, on that basis allege, that rather than define "direct physical loss or damage," Employers elected to leave the language as is, knowing that insureds could, and likely would, understand it to mean that virus- and pandemic-associated losses would be insured.

117. Employers further compounded the misleading nature of the Policy by omitting a virus exclusion that would have put insureds like the Tao Insureds on possible notice that losses like those associated with the current pandemic might not be insured. Although Employers referenced the contamination exclusion in its denial letter, it failed to articulate how a "hidden" exclusion bars coverage in whole or in part. Accordingly, the Policy does not include, and Employers consciously decided not to include any exclusions conspicuously, plainly, clearly, and unambiguously barring coverage for these losses.

118. To the extent not waived or otherwise excused, the Tao Insureds have complied with the provisions contained in the Policy. Therefore, the Tao Insureds are entitled to all benefits of the insurance provided by the Policy.

## FIRST CAUSE OF ACTION

### *(Breach of Contract)*

119. Tao realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 118 above as though fully alleged herein.

120. The Tao Insureds performed all obligations required of them under the Policy, except as otherwise excused.

121. Employers breached its duties under the Policy by, *inter alia*, unreasonably taking the position that the Tao Insureds sustained no "direct physical loss or damage;" that the Tao Insureds were not entitled to any Time Element, Civil or Military Authority, or any other coverages under the Policy; by refusing to acknowledge that the presence of SARS-COV-2 constitutes "direct physical loss or damage" to property as that phrase is used in the Policy; and by refusing to acknowledge that the impairment of the use or function of property caused by the actual or potential

28

T023.001/314958.9

1  presence of SARS-CoV-2, the orders of civil authorities, and the need to mitigate constitutes "direct
2  physical loss or damage" to property as that phrase is used in the Policy.

3      122.    In addition, the Tao Insureds have incurred and continue to incur consequential
4  damages – including, but not limited to ongoing extra expenses and attorneys' fees – due to
5  Employers' wrongful, unjustified and unreasonable failure to issue payment of amounts due, and
6  improper treatment of the claim, with the result of wrongfully diverting the Tao Insureds from their
7  recovery efforts.

8      123.    The consequential damages resulting from Employers' conduct were within the
9  contemplation of the parties, at the time the Policy was sold, as the natural and probable result of a
10  breach of contract.

11      124.    The consequential damages resulting from Employers' conduct was foreseen and/or
12  should have been foreseen when the Policy was sold.

13      125.    The Tao Insureds' damages were foreseeable given the purpose and particular
14  circumstances of the property damage and business interruption coverage sold by Employers under
15  the Policy.

16      126.    As a direct and proximate result of Employers' acts and/or omissions, the Tao
17  Insureds have been damaged and will continue to sustain damage.

18      127.    As a result of Employers' breaches, the Tao Insureds request entry of judgment for
19  breach of contract, awarding payment of damages in an amount equal to the amount owed under the
20  Policy and consequential damages, each in amounts to be proven at trial.

21              **SECOND CAUSE OF ACTION**

22          ***(Violations of the Nevada Unfair Claims Practices Act, NRS 686A.310)***

23      128.    The Tao Insureds reallege and incorporate by reference each of the allegations
24  contained in paragraphs 1 through 118 and 120 through 126 above as though fully alleged herein.

25      129.    It is an improper and unfair claims practice for an insurer transacting business in
26  Nevada to engage in certain activities in violation of NRS 686A.310, also known as the Nevada
27  Unfair Claims Practices Act ("the Act").

28

**COMPLAINT AND JURY DEMAND**
T023.001/314958.9

130.    Employers violated the Act by, among other things, misrepresenting to the Tao Insureds the pertinent facts and/or insurance policy provisions regarding the Tao Insureds' claim for coverage.

131.    Employers violated the Act by, among other things, failing to effectuate a prompt, fair and equitable settlement of a claim in which its liability has become reasonably clear.

132.    Employers violated the Act by, among other things, failing to comply with various provisions of NAC 686A.660 by misrepresenting and failing to disclose all pertinent benefits, coverages, and other provisions of the insurance policy, and indeed, advising the Tao Insureds that their claim for coverage was unsupported.

133.    Employers' conduct constitutes oppression, fraud, and/or malice.  Specifically, Employers, by acting as alleged above, consciously and without cause disregarded the Tao Insureds' rights in bad faith during a time of crisis as the Tao Insureds sustained substantial losses.

134.    As a direct and proximate result of Employers' conduct, the Tao Insureds have suffered and will continue to suffer damages in excess of this Court's jurisdictional limits in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

### THIRD CAUSE OF ACTION

### *(Breach of the Implied Covenant of Good Faith and Fair Dealing)*

135.    The Tao Insureds reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 118, 120 through 126, and 129 through 133 above as though fully alleged herein.

136.    Implied in the Policy is a covenant Employers would act in good faith and deal fairly with the Tao Insureds, that Employers would do nothing to interfere with the right of the Tao Insureds to receive benefits due under the Policy, and that Employers would give at least the same level of consideration to the interests of the Tao Insureds as they gave to their own interests.

137.    Employers also had a duty under the Policy, the law in each of the States where the Tao Insureds have insured property, and under insurance industry custom, practice and standards,

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

to conduct a prompt and thorough investigation, including as to all bases that might support the Tao Insureds' claims for insurance coverage before reserving rights to deny, and denying, coverage.

138.    Instead of complying with these duties, Employers acted in bad faith by, among other things:

1.    failing to conduct a full and thorough investigation of the Tao Insureds' claim for insurance coverage and asserting grounds for denying coverage without conducting such investigation;

2.    wrongfully and unreasonably asserting grounds for denying coverage that it knew, or should have known, are not supported by, and in fact are contrary to, the terms of its Policy, the law in each of the states where the Tao Insureds have insured property, insurance industry custom and practice, and the facts;

3.    failing to fully inquire into the bases that might support coverage for the Tao Insureds' claim;

4.    failing to conduct an adequate investigation of the losses suffered by the Tao Insureds, and asserting grounds for disputing coverage based on its inadequate investigation;

5.    creating and implementing a course of action to automatically deny coverage for all business interruption claims relating to SARS-CoV-2, COVID-19, and subsequent events;

6.    unreasonably failing and refusing to honor its promises and representations in the Policy it sold to the Tao Insureds;

7.    giving greater consideration to its own interests than it gave to the interests of the Tao Insureds';

8.    compelling the Tao Insureds to file this suit in order to receive the contractual benefits which they bought and paid for; and

9.    otherwise acting as alleged above.

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

133. In breach of the implied covenant of good faith and fair dealing, Employers did the things and committed the acts alleged above for the purpose of consciously withholding from the Tao Insureds the rights and benefits to which they are entitled under the Policy.

134. Employers' actions are inconsistent with the reasonable expectations of the Tao Insureds, are contrary to established industry custom and practice, are contrary to the legal requirements in each of the States where the Tao Insureds have insured property, are contrary to the express terms of the Policy, and constitute bad faith.

135. As a direct and proximate result of Employers' actions, the Tao Insureds have been damaged in an amount exceeding the Court's jurisdictional limits. To the extent permitted by law, including pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), the Tao Insureds are also entitled to recover all attorneys' fees they reasonably incurred, and continue to incur, in the efforts to obtain the benefits due under the Policy that Employers has withheld, and is withholding, in bad faith. The Tao Insureds are also entitled to interest at the maximum legal rate.

136. The Tao Insureds are informed and believe, and on that basis allege, that Employers, acting through one or more of their respective officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of its business, performed, authorized, or ratified the bad faith conduct alleged above.

137. Employers' conduct exhibits a conscious disregard of the rights of the Tao Insureds, constituting oppression or malice. Employers engaged in a series of acts designed to deny the Tao Insureds the benefits due under the Policy. Specifically, by acting as alleged above, in light of information, facts, and relevant law to the contrary, Employers consciously disregarded the Tao Insureds' respective rights and forced the Tao Insureds to incur substantial financial losses, thereby inflicting substantial financial damage on the Tao Insureds. Employers ignored the Tao Insureds' interests and concerns with the requisite intent to injure within, for example, the meaning of California Civil Code section 3294. Therefore, the Tao Insureds are entitled to recover punitive damages from Employers in an amount sufficient to punish and make an example of the Insurers and to deter similar conduct in the future.

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

138.   The Tao Insureds have also incurred and continue to incur consequential damages including, but not limited to, ongoing extra expenses and attorneys' fees due to Employers' wrongful, unjustified and unreasonable failure to issue payment of amounts due, and improper treatment of the claim, all with the result of wrongfully diverting the Tao Insureds from their recovery efforts.

139.   The consequential damages resulting from the Employers' bad faith conduct and its breaches of its duty to act in good faith were within the contemplation of the parties at the time the Policy was sold, as the natural and probable result of a breach of the Policy.

140.   The consequential damages resulting from the Employers' bad faith conduct and its breaches of its duty to act in good faith were foreseen and/or should have been foreseen when the Policy was sold.

141.   The Tao Insureds' damages were foreseeable given the purpose and particular circumstances of the property damage and business interruption coverage sold by Employers under the Policy.

142.   As a result of the foregoing, the Tao Insureds request entry of judgment and an award of damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### *(Declaratory Judgment)*

143.   The Tao Insureds reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 118 above as though fully alleged herein.

144.   The Tao Insureds contends that they are entitled to coverage under the Policy for their losses as described herein.

145.   The Tao Insureds are informed and believe, and on that basis allege, that Employers disputes that the Tao Insureds are entitled to such coverage.  Therefore, an actual and justiciable controversy exists between the Tao Insureds and Employers concerning the interpretation and construction of the Policy, and the rights and obligations of the parties thereto, with respect to the Tao Insureds' claim.

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

146.    Pursuant to 28 U.S.C. § 2201, the Tao Insureds seek a judicial declaration by this Court in accord with their intentions and rejecting Employers' contentions and stating that the Tao Insureds' losses are insured under the Policy.

147.    A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their prospective rights and duties.

**PRAYER FOR RELIEF**

WHEREFORE, the Tao Insureds pray for relief as follows:

**ON THE FIRST CAUSE OF ACTION**

1.    For judgment in favor of the Tao Insureds and against Employers in an amount to be determined at trial, including compensatory and consequential, extra-contractual and/or punitive damages in an amount to be determined at trial, plus pre-and post-judgment interest;

**ON THE SECOND CAUSE OF ACTION**

2.    For judgment in favor of the Tao Insureds and against Employers in an amount to be determined at trial, including compensatory, consequential, extra-contractual and/or punitive damages in an amount to be determined at trial, plus pre-and post-judgment interest;

**ON THE THIRD CAUSE OF ACTION**

3.    For judgment in favor of the Tao Insureds and against Employers in an amount to be determined at trial, including compensatory, consequential, extra-contractual and/or punitive damages in an amount to be determined at trial, plus attorneys' fees and pre-and post-judgment interest;

**ON THE FOURTH CAUSE OF ACTION**

4.    For a declaratory judgment in favor of the Tao Insureds and against Employers, in accord with the Tao Insureds' contentions above and declaring that Employers are required to pay the Tao Insureds up to the limits of the Policy;

/././

/././

/././

/././

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9

1    **ON ALL CAUSES OF ACTION**

2        5.    For costs of suit herein; and

3        6.    For such other, further, and/or different relief as may be deemed just and proper.

4    DATED:  March 5, 2021

5                                    By:  */s/ Krista J. Nielson, Esq.*
                                          Robert D. Mitchell (California State Bar No. 138981)
6                                         (*Will comply with Local Rule IA 11-2 within 14 days*)
                                          Krista J. Nielson (Nevada State Bar No. 10698)
7                                         Ace C. Van Patten (Nevada State Bar No. 11731)
                                          TIFFANY & BOSCO, P.A.
8                                         10100 W. Charleston Blvd., Suite 220
9                                         Las Vegas, Nevada 89135
                                          Telephone: (702) 258-8200
10                                        Facsimile: (702) 258-8787
                                          E-mail:  RDM@tblaw.com
11                                        E-mail: KNielson@tblaw.com
                                          E-mail: AVP@tblaw.com
12
                                          Kirk Pasich (California State Bar No. 94242)
13                                        Christopher T. Pasich (California State Bar No. 299191)
                                          Caitlin S. Oswald (California State Bar No. 330974)
14                                        (*Will comply with Local Rule IA 11-2 within 14 days*)
                                          PASICH LLP
15                                        10880 Wilshire Boulevard, Suite 2000
16                                        Los Angeles, California 90024
                                          Telephone:  (424) 313-7860
17                                        Facsimile:   (424) 313-7890
                                          Email: KPasich@PasichLLP.com
18                                        Email: CPasich@PasichLLP.com
                                          Email: COswald@PasichLLP.com
19
                                          Peter A. Halprin (New York State Bar No. 4846895)
20                                        (*Will comply with Local Rule IA 11-2 within 14 days*)
                                          PASICH LLP
21                                        757 Third Avenue, 20th Floor
                                          New York, NY 10017
22                                        Telephone:  (646) 974-6470
                                          Facsimile:   (424) 313-7890
23                                        Email: PHalprin@PasichLLP.com

24                                        Attorneys for Plaintiff

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2

Plaintiff Tao Group Holdings, LLC hereby demands a trial by jury in this action.

3

DATED:  March 5, 2021

4

By:  */s/ Krista J. Nielson, Esq.*

5
Robert D. Mitchell (California State Bar No. 138981)
(*Will comply with Local Rule IA 11-2 within 14 days*)

6
Krista J. Nielson (Nevada State Bar No. 10698)

7
Ace C. Van Patten (Nevada State Bar No. 11731)
TIFFANY & BOSCO, P.A.

8
10100 W. Charleston Blvd., Suite 220

9
Las Vegas, Nevada 89135
Telephone: (702) 258-8200

10
Facsimile: (702) 258-8787
E-mail:  RDM@tblaw.com

11
E-mail: KNielson@tblaw.com
E-mail: AVP@tblaw.com

12
Kirk Pasich (California State Bar No. 94242)

13
Christopher T. Pasich (California State Bar No. 299191)
Caitlin S. Oswald (California State Bar No. 330974)

14
(*Will comply with Local Rule IA 11-2 within 14 days*)
PASICH LLP

15
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024

16
Telephone:  (424) 313-7860
Facsimile:   (424) 313-7890

17
Email: KPasich@PasichLLP.com
Email: CPasich@PasichLLP.com

18
Email: COswald@PasichLLP.com

19
Peter A. Halprin (New York State Bar No. 4846895)

20
(*Will comply with Local Rule IA 11-2 within 14 days*)
PASICH LLP

21
757 Third Avenue, 20th Floor
New York, NY 10017

22
Telephone:  (646) 974-6470
Facsimile:   (424) 313-7890

23
Email: PHalprin@PasichLLP.com

24
Attorneys for Plaintiff

25

26

27

28

T023.001/314958.9

1

## **LIST OF EXHIBITS**

2

**Exhibit 1:**      Exclusion of Loss Due to Virus or Bacteria

3

**Exhibit 2:**      Premier Policy Advertisement

4

**Exhibit 3:**      Liberty Mutual Insurance Policy

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT AND JURY DEMAND**

T023.001/314958.9